## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **ATHEROGENICS, INC.,** | ) | **Case No.  08-78200** |
| | ) | |
| **Debtor.** | ) | **Judge Massey** |
| | ) | |

**MOTION FOR ENTRY OF ORDERS PURSUANT TO 11 U.S.C. §§ 105, 363 AND 365 (A) AUTHORIZING AND SCHEDULING AN AUCTION AT WHICH THE DEBTOR WILL SOLICIT THE HIGHEST OR BEST BID FOR THE SALE OF THE ASSETS; (B) APPROVING BID PROCEDURES GOVERNING THE PROPOSED SALE; AND (C) APPROVING THE SALE OF THE ASSETS TO THE PARTY <u>SUBMITTING THE HIGHEST OR BEST BID</u>**

AtheroGenics, Inc. (the "Debtor") files this Motion for Entry of Orders Pursuant to 11 U.S.C. § § 105, 363 and 365 (A) Authorizing and Scheduling an Auction at Which the Debtor Will Solicit the Highest or Best Bid for the Sale of the Assets; (B) Approving the Bid Procedures Governing the Proposed Sale; and (C) Approving the Sale of the Assets to the Party Submitting the Highest or Best Bid (the "Motion").  In support of this Motion, the Debtor respectfully shows the Court as follows:

### <u>Summary of Relief Requested</u>

Pursuant to this Motion, the Debtor requests entry of (i) an order (the "Bid Procedures Order") approving a sale and bidding process as hereinafter described to be used in connection with the proposed sale of the Debtor's non-cash assets (the "Assets"), following an initial, interim hearing (the "Bid Procedures Hearing"), and (ii) an order (the "Sale Order") approving the sale of the Debtor's Assets to the bidder submitting the highest or best bid for the Assets in connection with the sale and bidding process following a final hearing (the "Sale Hearing").

## Jurisdiction

1.       This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and

1334.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2).

## Background

2.       On September 15, 2008 (the "Petition Date"), certain petitioning creditors filed an

involuntary petition (the "Involuntary Petition") for relief under Section 303 of Title 11 of the

United States Code (the "Bankruptcy Code") against the Debtor.

3.       On October 6, 2008, the Debtor filed its Consent to Entry for Order for Relief and

Motion to Convert Case to One Under Chapter 11 ("Consent and Motion to Convert").

4.       On October 15, 2008, the Court entered its Order Granting Relief Against the

Debtor and Approving the Debtor's Motion to Convert Case to One Under Chapter 11.  The

Debtor remains in possession of its property and continues to operate and manage its business as

a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  An

official committee of unsecured creditors (the "Committee") was appointed in this case on

October 17, 2008.

## The Marketing Effort

5.       After the filing of the Involuntary Petition, the Debtor and its advisors evaluated

the Debtor's alternatives and determined a sale of the Assets was in the best interests of the

Debtor, its estate, and its creditors.  Concurrently with the filing of the Consent and Motion to

Convert, the Debtor filed its Application to Retain Merriman Curhan & Ford Co. ("MCF") to

Provide Investment Banking and Financial Advisory Services (the "Application").  On October

16, 2008, the Court entered its Order granting the Application.

6.      The Debtor's primary non-cash Asset is its lead antioxidant and anti-inflammatory drug candidate, known as "AGI-1067."  The Debtor retained MCF to assist in marketing the Debtor's Assets because MCF has substantial experience in the pharma, biotech, and healthcare industries and is familiar with marketing such assets.

7.      Immediately following its retention, MCF began conducting an extensive marketing campaign as part of an effort to secure the maximum value for the Debtor's Assets. As part of its efforts, MCF contacted both strategic buyers (e.g., companies engaged in the healthcare industry) and financial buyers (e.g., private equity funds).  MCF contacted 106 potential purchasers and sent non-confidential information regarding the Assets to 96 of those potential purchasers.  Twelve potential purchasers entered into confidentiality agreements with the Debtor in order to obtain access to the Debtor's electronic diligence room.  Eight potential purchasers reviewed data in the electronic diligence room, and the Debtor's management team had due diligence conference calls or face to face meetings with nine potential purchasers.

8.      Despite the diligent marketing and sale efforts of the Debtor and MCF, this is a difficult and unprecedented time in the financial markets and potential purchasers are facing extraordinarily tight credit markets.  There were potential purchasers that initially appeared willing to pay considerable sums for the Assets, but they were unable to arrange the financing necessary to purchase the Assets or otherwise declined to pursue this opportunity.  As such, there is only one remaining party expressing interest in the Assets.

9.      The Debtor proposes to sell the Assets on an expedited basis.  The marketing effort consumed a significant amount of time, and the Debtor incurred significant operating expenses during this time.  In order to preserve the value of AGI-1067, the Debtor has maintained certain of its employees and consultants, freezer space for specimens, and other

necessary equipment.  The Debtor also has certain reporting and regulatory deadlines

approaching that will require additional consulting work.  These obligations are causing

significant cash burn each month.  Given the disappointing results of the sale process and in

order to prevent the cash burn from offsetting any proceeds from the sale, the Debtor believes

that it is in its creditors' best interest to monetize the Assets as soon as possible.

**<u>Argument</u>**

10.    The Debtor is currently in advanced discussions with one potential purchaser

regarding a sale of the Assets, and the Debtor anticipates that it will enter into a definitive

agreement providing for a sale of the Assets to such potential purchaser (the "Stalking Horse

Bidder") prior to the Bid Procedures Hearing.  Attached hereto as <u>Exhibit A</u> is a form asset

purchase agreement (the "Agreement"), and the Debtor believes that any definitive agreement

entered into with the Stalking Horse Bidder will be substantially identical to such form

Agreement.[1]  The Agreement contemplates the sale of the Assets (subject to higher or better

bids) and contains the following material terms:

- Purchase Price - $2,000,000, paid in immediately available funds at closing;
- Purchased Assets -substantially all of the Debtor's assets (other than cash);
- Assumed Liabilities - include "cure" payments under assumed contracts and certain pro-rated costs, expenses and liabilities;
- Deposit – $200,000, tendered on the execution date of the Agreement;
- Post-Closing Indemnification - none.

11.    The Agreement will be "tested" in the marketplace by the sale and bidding

process described below so as to ensure that the estate realizes the maximum value for the

Assets.  The Debtor has developed the following proposed process for continuing to market the

Assets for sale (the "Proposed Sale Process").  In connection therewith, the Debtor requests that

---

[1]    The Debtor will file and serve a true and correct copy of any definitive agreement entered into with the
Stalking Horse Bidder prior to the Bid Procedures Hearing.

this Court approve the Proposed Sale Process, including the following bid procedures (the "Bid

Procedures"):

(i)     <u>Initial Overbid</u>. Any third party other than the Stalking Horse Bidder that is interested in acquiring the Assets must submit an "Initial Overbid" in conformance with the Bid Procedures by not later than 10:00 a.m. local time in Atlanta, Georgia on March 23, 2009 (the "Overbid Deadline"). Any such Initial Overbid must:

(a)     Contain a signed definitive asset purchase agreement (together with a copy of the signed agreement that is marked to show changes from the Agreement) with, at a minimum, the following requirements: (i) having substantially identical terms and conditions as the Agreement, except with higher and better consideration; (ii) containing terms and conditions no less favorable to the Debtor's estate than the terms and conditions in the Agreement (provided that no Initial Overbid shall provide for the payment to the overbidder of any breakup fee, topping fee, expense reimbursement or other similar arrangement); (iii) provide for a purchase price in excess of the sum of (1) $2,000,000, (2) the Bid Protections (as defined below), and (3) $100,000; and (iv) not be subject to any (1) financing contingency, (2) contingency relating to the completion of unperformed due diligence, (3) contingency related to the approval of the overbidder's board of directors or other internal approvals or consents, or (4) any conditions precedent to the overbidder's obligation to purchase the Assets other than those in the Agreement;

(b)     Include a cashiers' or certified check (payable to the order of King & Spalding LLP) representing a deposit in the amount of $200,000 (it being understood that deposits may also be sent by wire transfer of immediately available funds);

(c)     To the extent not previously provided to the Debtor, be accompanied by evidence satisfactory to the Debtor in its commercially reasonable discretion that the overbidder is willing, authorized, capable and qualified financially, legally and otherwise, of unconditionally performing all obligations under the Agreement (or its equivalent) in the event that it submits the Prevailing Bid (as defined below) at the Auction (as defined below);

(d)     Remain open and irrevocable until five days after the entry of an order by the Court approving a definitive agreement providing for the sale of the Assets; and

(e)     Be submitted to (i) AtheroGenics, Inc., 8995 Westside Parkway, Alpharetta, Georgia 30004, Attention: Joseph M. Gaynor, Jr., (ii) King & Spalding LLP, 1180 Peachtree Street, Atlanta, Georgia 30309, Attention: Paul Ferdinands (counsel for the Debtor), (iii) Office of the United States Trustee, 75 Spring Street, S.W., Atlanta, Georgia 30303, and (iv) Akin

Gump Strauss Hauer & Feld, LLP, One Bryant Park, New York, New York 10036, Attention: David A. Botter (counsel for the Committee), in each case so as to be received not later than the Overbid Deadline. The Debtor may extend the Overbid Deadline without further notice and for one or more bidders, but shall not be obligated to do so.

(ii)   <u>Auction</u>. In the event that the Debtor timely receives a conforming Initial Overbid from a prospective purchaser as described above (a "Qualified Bidder"), then the Debtor will conduct an auction with respect to the sale of the Assets on March 24, 2009, beginning at 9:00 a.m. local time, at the offices of Debtor's counsel, King & Spalding LLP, located at 1180 Peachtree Street, Atlanta, Georgia 30309, or at such other location as may be designated by the Debtor (the "Auction"). Based upon the terms of the qualified bids received and such other information as the Debtor determines is relevant, the Debtor (in its sole discretion) may conduct the Auction in the manner the Debtor determines will achieve the maximum realizable value for the Assets. In order to participate in the Auction, each prospective purchaser shall be required to comply with the requirements of the Bid Procedures and to submit an Initial Overbid that is timely and that complies in all respects with the Bid Procedures Order. At the Auction, Qualified Bidders may submit successive bids in increments of at least $100,000 greater than the prior bid (the "Incremental Bid Amount") for the purchase of the Assets until there is only one offer that the Debtor determines, subject to Bankruptcy Court approval, is the highest or best offer (the "Prevailing Bid"). When bidding at the Auction, the Stalking Horse Bidder shall receive a "credit" in the amount of the Bid Protections. All bidding for the Assets will be concluded at the Auction and there will be no further bidding at the Sale Hearing. If no conforming Initial Overbid from a Qualified Bidder shall have been received at or prior to the Overbid Deadline, the Auction will not be held and the Sale Hearing will proceed with respect to the Agreement. The Stalking Horse Bidder will be deemed a Qualified Bidder for all purposes.

(iii)   <u>Bid Protections</u>. Upon the consummation of a sale of all or a material amount of the Assets to any third party (other than the Stalking Horse Bidder) who submits a "higher or better" offer for the Assets, the Debtor shall pay to the Stalking Horse Bidder cash or other immediately available funds in an amount equal to $200,000 plus the reimbursement of actual, reasonable, out-of-pocket expenses incurred in connection with due diligence investigation and the negotiation of the Agreement in an amount that does not exceed $200,000 (collectively, the "Bid Protections"); <u>provided</u>, <u>however</u>, the Bid Protections shall be due and payable to the Stalking Horse Bidder only in the event that (A) the Debtor consummates a sale of the Assets to a party (other than the Stalking Horse Bidder) who submits a higher or better offer for the Assets pursuant to the Bid Procedures, and (B) the Agreement shall not have been terminated by the Debtor due to a material breach by the Stalking Horse Bidder. The Bid Procedures Order shall provide that any payment of the Bid Protections shall be deemed to be an administrative expense, with priority over any and all claims of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code.

(iv)  Sale Hearing.  The Sale Hearing will be conducted at 2:00 p.m. local time, on March 24, 2009, in Courtroom 1404, United States Courthouse, 75 Spring Street, S.W., Atlanta, Georgia, at which time the Debtor intends to present the Prevailing Bid for approval by the Court pursuant to the provisions of Sections 105, 363(b), 363(f), 363(m), 363(n) and 365 of the Bankruptcy Code.  The Debtor shall be deemed to have accepted a bid only when the bid has been approved by the Court at the Sale Hearing.  Upon the failure to consummate a sale of the Assets after the Sale Hearing because of the occurrence of a breach or default under the terms of the Prevailing Bid, the next highest or otherwise best bid, as disclosed at the Sale Hearing, shall be deemed the Prevailing Bid without further order of the Court and the parties shall be authorized to consummate the transaction contemplated by the backup Prevailing Bid (to the extent the party that submitted such backup Prevailing Bid is willing to serve as a backup bidder).

(v)  Highest and/or Best Bid.  At all times during the Proposed Sale Process, the Debtor shall retain full discretion and right to determine, in its sole discretion, which bid constitutes the highest or otherwise best offer for the purchase of the Assets, and which bid should be selected as the Prevailing Bid, if any, all subject to final approval by the Court pursuant to the provisions of Section 363(b) of the Bankruptcy Code.  Without limiting the generality of the foregoing, the Debtor may, at any time before entry of an order of the Court approving a Prevailing Bid, reject any bid (other than the Stalking Horse Bidder bid, as reflected in the Agreement) that, in the Debtor's sole discretion, the Debtor determines is (i) inadequate or insufficient, (ii) contrary to the requirements of the Bankruptcy Code or the Proposed Sale Process, or (iii) contrary to the best interests of the Debtor, its estate or its creditors.  The Debtor may adopt rules for the Auction that, in its judgment, will better promote the goals of the Auction and that are not inconsistent with any of the other provisions hereof or of any Bankruptcy Court order.

(vi)  Sale Implementation.  Following the approval of the Prevailing Bid at the Sale Hearing, the Debtor will be authorized to take all commercially reasonable and necessary steps to complete and implement the transaction(s) contemplated by the Prevailing Bid, including (but not limited to) seeking entry of one or more sale orders.

12.     The Debtor believes that the Proposed Sale Process offers the best opportunity for the Debtor to maximize the value of the Assets for the benefit of its estate and, therefore, the Debtor believes that implementation of the Proposed Sale Process is in the best interests of the estate herein, and should be approved.

## **Relief Requested**

13.     By this Motion, the Debtor requests that the Court grant the following relief:

    (a)      Following the Bid Procedures Hearing, enter an order approving the Proposed Sale Process and the Bid Procedures, including the procedures for submitting Initial Overbids, conducting the Auction, identifying the Prevailing Bid, and the payment of the Bid Protections; and

    (b)      Following the Sale Hearing, enter an order approving the sale of the Assets in accordance with the Proposed Sale Process and making the following determinations, among others, with respect to such sale:

        (i)      that such sale has been agreed upon, and will be made and completed, in good faith, for purposes of the provisions of Section 363(m) of the Bankruptcy Code;

        (ii)      that such sale shall be made, and the Assets shall be delivered to the successful bidder, free and clear of any and all liens, claims, encumbrances and interests (other than as specified in the definitive agreement); and

        (iii)      that the ten (10) day stay period provided for in Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure shall not be in effect with respect to the Sale Order and the Sale Order shall be effective and enforceable immediately upon its entry.

<u>**Argument**</u>

14.      As stated above, the Debtor believes that the Proposed Sale Process provides the Debtor with its best opportunity to preserve and maximize the value of the Assets for the benefit of its estate and, therefore, the Debtor believes that implementation of the Proposed Sale Process, and approval of any sale that is presented in accordance therewith, is in the best interests of the Debtor's creditors and estate.  As such, the Debtor submits that approval of this Motion and the Proposed Sale Process is consistent with applicable law and should be granted.

**A.**      **Section 363(b) Authorizes the Proposed Sale and Sale Process.**

15.      Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Although Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets, in applying this section, courts have

required that it be based upon the sound business judgment of the debtor.  See In re Chateaugay Corp., 973 F.2d 141 (2d Cir. 1992) (holding that a judge determining a Section 363(b) application must find from the evidence presented before him a good business reason to grant such application); Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (same); Stephens Indus. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986) (holding that "bankruptcy court can authorize a sale of all of a chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action"); In re Delaware & Hudson Ry. Co., 124 B.R. 169 (D. Del. 1991); In re Phoenix Steel Corp, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that judicial approval of a Section 363 sale requires a showing that the proposed sale is fair and equitable, a good business reason exists for completing the sale and that the transaction is in good faith).

16.     Although the Debtor cannot predict the results of the Proposed Sale Process and the Auction, the Debtor respectfully submits that the proposed sale and Proposed Sale Process fit squarely within the parameters of the sound business judgment test articulated in the above-referenced authorities.

17.     First and foremost, the Debtor has articulated a sound business purpose for any transaction emanating from the Auction.  As set forth above, the Debtor believes that a sale of the Assets is in the best interest of the Debtor's creditors.  Further, the Debtor's obligations are causing significant cash burn each month, and any delay in the sale of the Assets will cause additional cash burn that will offset the proceeds from the sale.  The Debtor would be prepared to close a transaction with the Stalking Horse Bidder even if no Initial Overbid is submitted by a competing bidder.

18.     The Debtor respectfully submits that the notice and timing of the Proposed Sale

Process are adequate and fair, and are reasonably calculated to elicit the highest levels of interest

in acquiring the Assets.  As described above, the Debtor has engaged in significant marketing of

the Assets in a very difficult and challenging economic environment.  Even though the

anticipated purchase price is lower than the Debtor or its creditors would like, the Debtor's

efforts, coupled with the Proposed Sale Process outlined above, will garner the highest and best

possible value for the Assets.

19.     The Debtor has made, and will continue to make, diligent efforts to seek out all

potentially credible buyers, having already contacted numerous parties.  As in the case of

Delaware & Hudson Ry. Co., the substantial solicitation and marketing efforts of the Debtor and

its professionals support the proposed process and the reasonableness of any offer ultimately

presented through that process.

20.     Moreover, because the Proposed Sale Process will create a fair and reasonable

environment in which all legitimate and qualified interest in the Assets can be presented in a

competitive, open and level playing field, any offer presented in accordance with the terms of the

Proposed Sale Process will necessarily be negotiated and presented in good faith.  In connection

therewith, the Debtor will be prepared to present further evidence of good faith during the course

of the Sale Hearing that will satisfy this Court and the mandates of Section 363(m) of the

Bankruptcy Code.

21.     The Debtor intends to give notice of the Procedures Hearing, the Sale Process, the

Sale Hearing and the proposed sale of the Debtor's Assets, by mailing a copy of the Motion, to

(i) the Internal Revenue Service and each of the relevant state and local taxing authorities; (ii)

counsel to the Committee; (iii) all entities having requested notices pursuant to Bankruptcy Rule

2002; (iv) the Office of United States Trustee; (v) all non-debtor parties to the executory

contracts and unexpired leases that may be assumed and assigned as part of the sale of the

Assets; and (vi) any entity holding or asserting a lien on the Assets (the persons listed in clauses

(i) through (vi) are referred to collectively as the "Notice Parties").  In addition to the foregoing,

the Debtor also proposes to give additional notice by mailing a copy of any Bid Procedures

Order entered by the Court within two business days of its entry to each of the Notice Parties and

the parties on the Master Service List.  The Debtor submits that the foregoing is sufficient notice

of the Procedures Hearing, the Sale Process, the Sale Hearing and the proposed sale of the

Debtor's Assets.

22.     By this Motion, the Debtor intends to sell the Assets in order to create a pool of

funds to distribute to its creditors.  The Debtor strongly believes that, in furtherance of these

goals, it has done all that is reasonably possible to secure the highest or best possible offer for the

Assets under the circumstances, and believes that any sale must be consummated as promptly as

practicable in order to prevent any further dissipation in value of the estate.  For all of the

foregoing reasons, the relief requested in this Motion is a product of sound business judgment

and is in the best interests of the Debtor, its creditors and its estate, and should be granted.

23.     Further, at all times throughout the marketing and sale process, the Debtor has

updated the Committee on its progress, and the Debtor anticipates that the Committee will be

supportive of this Motion at the Bid Procedures Hearing.

24.     Accordingly, the Debtor submits that the Proposed Sale Process, and any sale

presented in accordance therewith, is warranted and appropriate under the terms and provisions

of Section 363(b) of the Bankruptcy Code.

**B.**     **Section 363(f) Authorizes the Sale Free and Clear of Liens and Other Claims.**

25.     The Debtor requests that the sale and transfer of the Assets be approved free and clear of all liens, claims, encumbrances and other interests, other than those specifically assumed by the party submitting the Prevailing Bid.  Such relief is consistent with the provisions of Section 363(f) of the Bankruptcy Code in this case.

26.     Section 363(f) provides that a debtor-in-possession may sell property free and clear of any lien, claim or interest of another entity in such property if any of the following circumstances pertain

> (1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)    such entity consents;
>
> (3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)    such interest is in bona fide dispute; or
>
> (5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.
>
> 11 U.S.C. § 363(f).

27.     As indicated by the use of the disjunctive term "or," satisfaction of any one of the five requirements listed in Section 363(f) is sufficient to permit the sale of assets free and clear of liens, claims, encumbrances, pledges, mortgages, security interests, charges, options and other interests, including any right of setoff (collectively, the "Interests").  See In re Elliott, 94 B.R. 343, 345 (E.D. Pa. 1988) (stating that Section 363(f) is written in the disjunctive; the court may approve a sale "free and clear" provided that at least one of the subsections is met).

28.     In this instance, the Debtor believes that there are no entities holding or asserting a lien on the Assets.

29.    Moreover, Section 1129(b)(2)(A) of the Bankruptcy Code specifically allows a debtor to sell property subject to a lien, free and clear of such lien, if such lien attaches to the net proceeds of the sale, subject to any claims and defenses that the debtor may possess with respect thereto.  See In re Riverside Inv. P'ship, 674 F.2d 634, 640 (7th Cir. 1982).  In this case, the Debtor proposes that any Interests in the Assets (other than Permitted Liens and Assumed Liabilities, as such terms are defined in the Agreement) attach to the proceeds of the sale.  Accordingly, the requirements of Section 363(f) of the Bankruptcy Code can be satisfied, and the sale of the Assets free and clear of all liens, claims, encumbrances and other interests is appropriate.

**C.    The Prevailing Bidder Should Be Afforded All Protections Under Bankruptcy Code Section 363(m) as a Good Faith Purchaser.**

30.    Section 363(m) of the Bankruptcy Code provides that "the reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith . . ."  11 U.S.C. § 363(m).

31.    As discussed above, the Proposed Sale Process and the bidding procedures contemplated as a part thereof (if and in whatever form approved at the Bid Procedures Hearing), have been designed to create a fair, open and level playing field.  Accordingly, the Debtor requests that the party submitting the Prevailing Bid be determined to have acted in good faith and be entitled to the protections of a good faith purchaser under Section 363(m) of the Bankruptcy Code.  See, e.g., In re United Press Int'l, Inc., No. 91 B 13955 (FGC), 1992 U.S. Bankr. LEXIS 842, at *3 (Bankr. S.D.N.Y.  May 18, 1992).  In this regard, the transaction reflected in the Agreement was negotiated by the parties at arm's length and in good faith, and

the Stalking Horse Bidder and its affiliates (i) are not "insiders" or affiliates of the Debtor, and

(ii) do not have any relationship to the Debtor that has not been fully disclosed to the Court.

**D.      Section 365 Authorizes the Assumption and Assignment of Executory Contracts and Unexpired Leases.**

32.      The Agreement also contemplates the assumption of certain executory contracts

and unexpired leases and the assignment of these contracts and leases to the Stalking Horse

Bidder.  Accordingly, the Debtor also respectfully seeks provisions in the Sale Order (i)

authorizing the Debtor to assume and assign the Assumed Contracts (as such term is defined in

the Agreement) pursuant to Section 365 of the Bankruptcy Code, and (ii) deeming the parties to

the Assumed Contracts adequately assured of future performance.

33.      Section 365(a) of the Bankruptcy Code provides that a debtor in possession

"subject to the court's approval, may assume or reject any executory contract or unexpired lease

of the debtor."  11 U.S.C. § 365(a).  Courts evaluate a decision to assume or reject an executory

contract or unexpired  lease under the "business judgment" standard.  See Chateaugay Corp, 973

F.2d at 141; see also In re Gardinier, Inc., 831 F.2d 974, 976 n.2 (11th Cir. 1987); In re Wells,

227 B.R. 553, 564 (Bankr. M.D. Fla. 1998); see also NLRB v. Bildisco & Bildisco, 465 U.S.

513, 523 (1984).  This standard is satisfied if the debtor determines in its business judgment that

the assumption or rejection of the contract or lease would benefit the estate.  See Sharon Steel

Corp. v. National Fuel Gas Distr. Corp., 872 F.2d 36, 39-40 (3d Cir. 1989); In re Bicoastal Corp.,

125 B.R. 658, 667 (Bankr. M.D. Fla. 1991).  The business judgment standard requires that the

court approve the debtor's business decision unless that judgment is the product of bad faith,

whim, or caprice.  See Lubrizol Enter. v. Richmond Metal Finishers, Inc., 756 F.2d 1043, 1047

(4th Cir. 1985); In re Prime Motor Inns, 124 B.R. 378, 383 (S.D. Fla. 1991).

34.     Here, the Assumed Contracts are integral Assets, and the Debtor has determined, in the exercise of its business judgment, that the assumption and assignment of the Assumed Contracts in connection with a sale of the Assets is necessary to yield significant value and benefit to the Debtor and its estate from the sale of the Assets.

35.     The Debtor strongly believes that, in furtherance of the goal of maximizing value for its estate and creditors, it has done all that is possible to secure the highest or best possible offer for the Assets under the circumstances, which includes the Stalking Horse Bidder's agreement to pay the cure costs.   Accordingly, the Debtor respectfully requests that this Court include in the Sale Order provisions (i) authorizing the Debtor to assume and assign the Assumed Contracts to the Stalking Horse Bidder (or to the party that submits the Prevailing Bid) pursuant to Section 365 of the Bankruptcy Code, and (ii) deeming the parties to the Assumed Contracts adequately assured of future performance by the Stalking Horse Bidder (or by the party that submits the Prevailing Bid).

**E.     The Proposed Bid Procedures and Bid Protections Are Appropriate.**

36.     The Debtor has formulated a bidding process that the Debtor believes will induce prospective competing bidders to expend the time, energy and resources necessary to submit an Initial Overbid, and which the Debtor believes is fair and reasonable in view of the assets to be sold.  The Proposed Sale Process and, in particular, the proposed Bid Protections, are reasonable and supported by applicable case law.

37.     Historically, bankruptcy courts have approved bidding incentives, including break-up fees awarded to an initial bidder or "stalking horse," in the event of a successful overbid based on the business judgment of the debtor.  See, e.g., In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (bidding incentives may "be legitimately necessary

to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking"); In re Integrated Resources, Inc., 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (noting that "the business judgment of the Debtor is the standard applied under the law in this district" and applying the standard to a break-up fee).

38.     The Third Circuit Court of Appeals has also addressed the appropriate standard for determining whether proposed bidding incentives in the bankruptcy context are appropriate. In Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl Energy, Inc.), 181 F.3d 527 (3d Cir. 1999), the Court of Appeals held that even though bidding incentives are measured against a business judgment standard in nonbankruptcy transactions, the administrative expense provisions of Section 503(b) of the Bankruptcy Code govern bidding incentives in the bankruptcy context.  Finding no "compelling justification" for treating an application for break-up fees and expenses under Section 503(b) any differently from other applications for administrative expenses, the Court concluded that "the determination whether break-up fees or expenses are allowable under § 503(b) must be made in reference to general administrative expense jurisprudence.  In other words, the allowance of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate."  Id. at 535.

39.     In O'Brien, the Third Circuit identified at least two circumstances in which bidding incentives may provide actual benefit to the estate, justifying administrative expense status.  First, there exists an actual benefit to the estate when "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited."  Id. at 537.  Second, when the availability of bidding incentives induces a prospective buyer to research the value of the debtor

and submit a bid that serves as a minimum bid on which other bidders can rely, the initial

"bidder may have provided a benefit to the estate by increasing the likelihood that the price at

which the Debtors is sold will reflect its true worth." <u>Id</u>.  Both of those circumstances exist in

this case, because the inducement of the Bid Protections was critical in persuading the Stalking

Horse Bidder to make an initial offer, which will serve as a "floor" for other bidders in

connection with the Proposed Sale Process, and to expend the time and resources associated with

conducting due diligence regarding the Assets and with negotiating and entering into the

Agreement.

40.     Under the "administrative expense" standard enunciated in <u>O'Brien</u>, as well as the

"sound business judgment" standard followed in other jurisdictions, the Bid Procedures proposed

by the Debtor should be approved as fair and reasonable.

41.     Admittedly, the Bid Protections are high in relation to the purchase price.

However, the Assets have speculative value and any purchaser will spend millions of dollars to

further develop AGI-1067.  Further, the Stalking Horse Bidder would not proceed without the

Bid Protections.  Given that the Stalking Horse Bidder is the only party interested in purchasing

the Assets, the Debtor believes the Bid Protections are reasonable under the circumstances.  The

Bid Protections also are generally consistent with the range of bidding protection typically

approved by bankruptcy courts in cases in this district.  <u>See, e.g.</u>, <u>In re Centennial HealthCare

Corporation</u>, No. 02-74974 (Bankr. N.D. Ga. July 3, 2003) (J. Massey).

42.     Therefore, because the procedures and incentives included in the Proposed Sale

Process, including the proposed Bid Protections, are fair and reasonable, are reasonably

calculated to produce the best and highest offers for the Assets and thereby confer actual benefits

upon the estate herein, and are within the upper range of incentives customarily approved by courts, such procedures should be approved in this Chapter 11 case.

## **Notice**

43.     This Motion will be served, and further notice of the Auction, the Proposed Sale Process, the Sale Hearing and the proposed sale of the Debtor's Assets will be given, in accordance with the procedures set forth above.  The Debtor respectfully submits that such notice is sufficient and proper under the circumstances, and that no other or further notice is required.

## **Conclusion**

WHEREFORE, based upon the foregoing, the Debtor respectfully requests that the Court (a) enter an order following the Bid Procedures Hearing, substantially in the form attached hereto, (i) approving the Proposed Sale Process (including payment of the Bid Protections), and (ii) authorizing the Debtor to take all actions reasonably necessary to effectuate such Proposed Sale Process and the sale presented in accordance therewith; (b) enter the Sale Order following the Sale Hearing, approving the highest or best bid for the Assets and granting the other relief requested in this Motion; and (c) granting such other and further relief as the Court deems just and proper.

This 11th day of March 2009.

Respectfully submitted,

KING & SPALDING LLP


/s/ Paul K. Ferdinands
James A. Pardo, Jr.
Georgia Bar No. 561206
jpardo@kslaw.com
Paul K. Ferdinands
Georgia Bar No. 258623
pferdinands@kslaw.com
Michelle L. Carter
Georgia Bar No. 114571
mcarter@kslaw.com
1180 Peachtree Street
Atlanta, Georgia  30309-3521
Telephone:     (404) 572-4600
Facsimile:     (404) 572-5129

COUNSEL FOR THE DEBTOR

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **ATHEROGENICS, INC.,** | ) | **Case No.  08-78200** |
| | ) | |
| Debtor. | ) | **Judge Massey** |
| | ) | |

**ORDER (A) AUTHORIZING AND SCHEDULING AN AUCTION AT WHICH THE
DEBTOR WILL SOLICIT THE HIGHEST OR BEST BID FOR THE
SALE OF THE ASSETS; (B) APPROVING BID PROCEDURES GOVERNING
THE PROPOSED SALE; AND (C) APPROVING THE SALE OF THE
ASSETS TO THE PARTY SUBMITTING THE HIGHEST OR BEST BID**

Upon consideration of the Motion for Entry of Orders Pursuant to 11 U.S.C. § § 105, 363

and 365 (A) Authorizing and Scheduling an Auction at Which the Debtor Will Solicit the

Highest or Best Bid for the Sale of the Assets; (B) Approving the Bid Procedures Governing the

Proposed Sale; and (C) Approving the Sale of the Assets to the Party Submitting the Highest or

Best Bid dated March 11, 2009 (the "Motion"),[1] of AtheroGenics, Inc. (the "Debtor"), for entry

of (i) an order approving a sale and bidding process as hereinafter described to be used in

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

connection with the proposed sale of the assets (the "Assets"), following an initial, interim

hearing, and (ii) an order approving the sale by the Debtor of the Assets to the Stalking Horse

Bidder or to the bidder submitting the highest or best bid for the Assets in connection with the

sale and bidding process following a final hearing; and an interim hearing regarding the Motion

having been held on March 17, 2009 (the "Bid Procedures Hearing"); and based upon all of the

evidence proffered or adduced at the Bid Procedures Hearing; and after consideration of any

memoranda, objections, or other pleadings filed in connection with the Bid Procedures Hearing;

and after consideration of the arguments of counsel made at the Bid Procedures Hearing; and

upon the entire record of this case; and it appearing that the approval of the Bid Procedures as

requested in the Motion is in the best interests of the Debtor, its estate and creditors; and after

due deliberation thereon; and good and sufficient cause appearing therefor, it is hereby

FOUND AND DETERMINED THAT:

A.      The form and manner of notice of the Bid Procedures and the Bid Procedures

Hearing shall be, and hereby are, approved as sufficient and adequate notice.  No other or further

notice in connection with the entry of this Order is or shall be required.

B.      The Bid Procedures were proposed by the Debtor in good faith with the goal of

maximizing the value of the Assets for the benefit of all creditors of its estate.

C.      Approval of the Bid Protections is a necessary and appropriate inducement to the

Stalking Horse Bidder to (i) make an initial offer which will serve as a "floor" for further

bidding, and (ii) to negotiate and enter into the Agreement.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED

THAT:

1.     The Motion is granted to the extent set forth in this Order.  The following Bid

Procedures are hereby approved and shall be used in connection with the proposed sale of the

Assets:

(i)     <u>Initial Overbid</u>.  Any third party other than the Stalking Horse Bidder that is interested in acquiring the Assets must submit an "Initial Overbid" in conformance with the Bid Procedures by not later than 10:00 a.m. local time in Atlanta, Georgia on March 23, 2009 (the "Overbid Deadline").  Any such Initial Overbid must:

(a)     Contain a signed definitive asset purchase agreement (together with a copy of the signed agreement that is marked to show changes from the Agreement) with, at a minimum, the following requirements:  (i) having substantially identical terms and conditions as the Agreement, except with higher and better consideration; (ii) containing terms and conditions no less favorable to the Debtor's estate than the terms and conditions in the Agreement (provided that no Initial Overbid shall provide for the payment to the overbidder of any breakup fee, topping fee, expense reimbursement or other similar arrangement); (iii) provide for a purchase price in excess of the sum of (1) $2,000,000, (2) the Bid Protections (as defined below), and (3) $100,000; and (iv) not be subject to any (1) financing contingency, (2) contingency relating to the completion of unperformed due diligence, (3) contingency related to the approval of the overbidder's board of directors or other internal approvals or consents, or (4) any conditions precedent to the overbidder's obligation to purchase the Assets other than those in the Agreement;

(b)     Include a cashiers' or certified check (payable to the order of King & Spalding LLP) representing a deposit in the amount of $200,000 (it being understood that deposits may also be sent by wire transfer of immediately available funds);

(c)     To the extent not previously provided to the Debtor, be accompanied by evidence satisfactory to the Debtor in its commercially reasonable discretion that the overbidder is willing, authorized, capable and qualified financially, legally and otherwise, of unconditionally performing all obligations under the Agreement (or its equivalent) in the event that it submits the Prevailing Bid (as defined below) at the Auction (as defined below);

(d)     Remain open and irrevocable until five days after the entry of an order by the Court approving a definitive agreement providing for the sale of the Assets; and

(e)     Be submitted to (i) AtheroGenics, Inc., 8995 Westside Parkway, Alpharetta, Georgia 30004, Attention:  Joseph M. Gaynor, Jr., Esq., (ii) King & Spalding LLP, 1180 Peachtree Street, Atlanta, Georgia 30309,

Attention: Paul Ferdinands (counsel for the Debtor), (iii) Office of the United States Trustee, 75 Spring Street, S.W., Atlanta, Georgia 30303, and (iv) Akin Gump Strauss Hauer & Feld, LLP, One Bryant Park, New York, New York 10036, Attention: David A. Botter (counsel for the Committee), in each case so as to be received not later than the Overbid Deadline. The Debtor may extend the Overbid Deadline without further notice and for one or more bidders, but shall not be obligated to do so.

(ii)     Auction. In the event that the Debtor timely receives a conforming Initial Overbid from a prospective purchaser as described above (a "Qualified Bidder"), then the Debtor will conduct an auction with respect to the sale of the Assets on March 24, 2009, beginning at 9:00 a.m. local time, at the offices of Debtor's counsel, King & Spalding LLP, located at 1180 Peachtree Street, Atlanta, Georgia 30309, or at such other location as may be designated by the Debtor (the "Auction"). Based upon the terms of the qualified bids received and such other information as the Debtor determines is relevant, the Debtor (in its sole discretion) may conduct the Auction in the manner the Debtor determines will achieve the maximum realizable value for the Assets. In order to participate in the Auction, each prospective purchaser shall be required to comply with the requirements of the Bid Procedures and to submit an Initial Overbid that is timely and that complies in all respects with the Bid Procedures Order. At the Auction, Qualified Bidders may submit successive bids in increments of at least $100,000 greater than the prior bid (the "Incremental Bid Amount") for the purchase of the Assets until there is only one offer that the Debtor determines, subject to Bankruptcy Court approval, is the highest or best offer (the "Prevailing Bid"). When bidding at the Auction, the Stalking Horse Bidder shall receive a "credit" in the amount of the Bid Protections. All bidding for the Assets will be concluded at the Auction and there will be no further bidding at the Sale Hearing. If no conforming Initial Overbid from a Qualified Bidder shall have been received at or prior to the Overbid Deadline, the Auction will not be held and the Sale Hearing will proceed with respect to the Agreement. The Stalking Horse Bidder will be deemed a Qualified Bidder for all purposes.

(iii)     Sale Hearing. The Sale Hearing will be conducted at 2:00 p.m. local time, on March 24, 2009, in Courtroom 1404, United States Courthouse, 75 Spring Street, S.W., Atlanta, Georgia, at which time the Debtor intends to present the Prevailing Bid for approval by the Court pursuant to the provisions of Sections 105, 363(b), 363(f), 363(m), 363(n) and 365 of the Bankruptcy Code. The Debtor shall be deemed to have accepted a bid only when the bid has been approved by the Court at the Sale Hearing. Upon the failure to consummate a sale of the Assets after the Sale Hearing because of the occurrence of a breach or default under the terms of the Prevailing Bid, the next highest or otherwise best bid, as disclosed at the Sale Hearing, shall be deemed the Prevailing Bid without further order of the Court and the parties shall be authorized to consummate the transaction contemplated by the backup Prevailing Bid (to the extent the party that submitted such backup Prevailing Bid is willing to serve as a backup bidder).

(iv)   <u>Highest and/or Best Bid</u>.  At all times during the Proposed Sale Process, the Debtor shall retain full discretion and right to determine, in its sole discretion, which bid constitutes the highest or otherwise best offer for the purchase of the Assets, and which bid should be selected as the Prevailing Bid, if any, all subject to final approval by the Court pursuant to the provisions of Section 363(b) of the Bankruptcy Code.  Without limiting the generality of the foregoing, the Debtor may, at any time before entry of an order of the Court approving a Prevailing Bid, reject any bid (other than the Stalking Horse Bidder bid, as reflected in the Agreement) that, in the Debtor's sole discretion, the Debtor determines is (i) inadequate or insufficient, (ii) contrary to the requirements of the Bankruptcy Code or the Proposed Sale Process, or (iii) contrary to the best interests of the Debtor, its estate or its creditors.  The Debtor may adopt rules for the Auction that, in its judgment, will better promote the goals of the Auction and that are not inconsistent with any of the other provisions hereof or of any Bankruptcy Court order.

(v)   <u>Sale Implementation</u>.  Following the approval of the Prevailing Bid at the Sale Hearing, the Debtor will be authorized to take all commercially reasonable and necessary steps to complete and implement the transaction(s) contemplated by the Prevailing Bid, including (but not limited to) seeking entry of one or more sale orders.

2.     Objections (if any) to approval of any Prevailing Bid or to approval of any proposed sale of the Assets, or any proposed assumption and assignment of executory contracts and unexpired leases pursuant to any Prevailing Bid, shall be in writing, shall set forth the name of the objecting party, the basis for the objection and the specific grounds therefore, and shall be filed with the Court and served upon each of the following so as to be actually received on or before 12:00 p.m. on March 24, 2009: (i) AtheroGenics, Inc., 8995 Westside Parkway, Alpharetta, Georgia 30004, Attention:  Joseph M. Gaynor, Jr., (ii) King & Spalding LLP, 1180 Peachtree Street, Atlanta, Georgia 30309, Attention: Paul Ferdinands (counsel for the Debtor), (iii) Office of the United States Trustee, 75 Spring Street, S.W., Atlanta, Georgia 30303, and (iv) Akin Gump Strauss Hauer & Feld, LLP, One Bryant Park, New York, New York 10036, Attention:  David A. Botter (counsel for the Committee).  Any objection not filed and served in accordance with this paragraph shall be deemed waived and shall be forever barred.

4

3.      The failure of any third party to file and serve an objection as ordered and directed herein shall be deemed the consent of such party to the granting of the Motion and the sale and transfer of the Assets (including the assumption and assignment of executory contracts and unexpired leases under the Prevailing Bid).

4.      The Debtor is authorized to pay to the Stalking Horse Bidder an amount equal to $200,000 plus the reimbursement of actual, reasonable, out-of-pocket expenses incurred in connection with due diligence investigation and the negotiation of the Agreement in an amount that does not exceed $200,000.00 (collectively, the "Bid Protections"); provided, however, the Bid Protections shall be due and payable to the Stalking Horse Bidder only in the event that (A) the Debtor consummates a sale of the Assets to a party (other than the Stalking Horse Bidder) who submits a higher or better offer for the Assets pursuant to the Bid Procedures, and (B) the Agreement shall not have been terminated by the Debtor due to a material breach by the Stalking Horse Bidder.  The Bid Procedures Order shall provide that any payment of the Bid Protections shall be deemed to be an administrative expense, with priority over any and all claims of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code.

5.      The Bid Procedures (including the Bid Protections) are fair and reasonable, are reasonably calculated to produce the best and highest offers for the Assets, and will confer actual benefits upon the Debtor's estate.  The Bid Procedures represent an exercise of the Debtor's sound business judgment and will facilitate an orderly sale process.

6.      The Debtor shall serve a copy of this Order as contemplated in the Motion.

END OF DOCUMENT.

Prepared and presented by:

KING & SPALDING LLP


/s/_____
James A. Pardo, Jr.
Georgia Bar No. 561206
jpardo@kslaw.com
Paul K. Ferdinands
Georgia Bar No. 258623
pferdinands@kslaw.com
Michelle L. Carter
Georgia Bar No. 114571
mcarter@kslaw.com
1180 Peachtree Street
Atlanta, Georgia  30309-3521
Telephone:      (404) 572-4600
Facsimile:      (404) 572-5129

COUNSEL FOR THE DEBTOR